# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 40322**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Douglas M. FOLTS**
Technical Sergeant (E-6), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary[1]

Decided 26 August 2024

———————————

*Military Judge*: Brian C. Mason.

*Sentence*: Sentence adjudged on 27 February 2022 by GCM convened at Eielson Air Force Base, Alaska. Sentence entered by military judge on 9 March 2022: Confinement for 16 days and forfeiture of $3,000.00 pay per month for 6 months.

*For Appellant*: Major Kasey W. Hawkins, USAF; Captain Samantha M. Castanien, USAF; Terri R. Zimmermann, Esquire.

*For Appellee*: Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel J. Peter Ferrell, USAF; Major Olivia B. Hoff, USAF; Major Jocelyn Q. Wright, USAF; Captain Kate E. Lee, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, ANNEXSTAD, and GRUEN, *Appellate Military Judges*.

---

[1] Appellant appeals his conviction under Article 66(b)(1)(A), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 866(b)(1)(A), pursuant to the National Defense Authorization Act for Fiscal Year 2023, Pub. L. No. 117–263, § 544, 136 Stat. 2395, 2582–84 (23 Dec. 2022).

Senior Judge ANNEXSTAD delivered the opinion of the court, in which Chief Judge JOHNSON and Judge GRUEN joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

ANNEXSTAD, Senior Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of sexual abuse of a child by committing a lewd act in violation of Article 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920b.[2,3] The military judge sentenced Appellant to confinement for 16 days, and to forfeit $3,000.00 pay per month for six months. The convening authority took no action on the findings and approved the sentence in its entirety.

Appellant raised three issues on appeal, which we have reworded: (1) whether Appellant's conviction was legally and factually sufficient; (2) whether Appellant was provided fair notice that sending three memes constituted sexual abuse of a child; and (3) whether as applied to this case, reference to 18 U.S.C. § 922 in the staff judge advocate's indorsement to the entry of judgment is unconstitutional because the Government cannot demonstrate that barring his possession of firearms is "consistent with the nation's historical tradition of firearm regulation" when he was not convicted of a violent offense.[4] We also considered an additional issue, not raised by Appellant: (4) whether Appellant is entitled to relief for unreasonable appellate delay in accordance with *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006), or in the alternative, *United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002).

With respect to issue (3), we have carefully considered this issue and find Appellant is not entitled to relief. *See United States v. Lepore,* 81 M.J. 759, 763 (A.F. Ct. Crim. App. 2021) (en banc) (holding a Court of Criminal Appeals lacks the authority to direct modification of the 18 U.S.C. § 922(g) prohibition noted on the staff judge advocate's indorsement); *see also United States v. Vanzant*, __ M.J. __, No. ACM 22004, 2024 CCA LEXIS 215, at *24 (A.F. Ct. Crim. App.

---

[2] Unless otherwise noted, all references to the UCMJ, the Military Rules of Evidence (Mil. R. Evid.), and the Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[3] Appellant was acquitted of two specifications of sexual abuse of a child in violation of Article 120b, UCMJ, 10 U.S.C. § 920b.

[4] Citing *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022).

28 May 2024) (concluding "[t]he firearms prohibition remains a collateral consequence of the conviction, rather than an element of findings or sentence, and is therefore beyond our authority to review").

As to the remaining issues, we find no error that materially prejudiced Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

In 2014, Appellant married CF who had two children from a previous marriage: a daughter, OM, and a younger son. Pursuant to a custody agreement, Appellant and CF shared joint custody of the two children with CF's ex-husband, DM, who was also an active-duty service member. In 2019, OM was 13 years old and lived with DM in Germany. Meanwhile, Appellant was stationed in Alaska. While in Germany, OM, who had developed a good relationship with Appellant, began communicating with Appellant via Skype, an instant messaging, voice, and video calling application.

In September 2019, while OM was in eighth grade, OM shared with Appellant over Skype that she had a girlfriend. During their conversation, Appellant told OM that he thought she "would say yes to anyone who asked [her] out regardless of race, sex or gender." Towards the end of the chat conversation, Appellant sent OM two memes.[5] The first is a photo of what appears to be the buttocks of two women wearing athletic spandex shorts. The second is a photo of two women in bikinis. Both photos depict varying lower and upper body proportions, respectively. The words "garlic bread" were superimposed over the buttocks and chest of the women with larger proportions, while the word "bread" was superimposed over the women with smaller proportions. After sending the memes, Appellant sent a follow-up message suggesting that OM and her girlfriend "would appreciate these."

At Appellant's court-martial, OM testified that she was surprised when Appellant sent her the memes, because he had never sent anything like that before she started "developing" during eighth grade. OM explained that she interpreted the memes as having a sexual connotation, because they suggested the women with larger buttocks and breasts were more sexually attractive than those with smaller proportions, much like how "garlic bread is better than just regular bread."

---

[5] A "meme" is defined as "an amusing or interesting item (such as a captioned picture or video) or genre of items that is spread widely online especially through social media." *Meme*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/meme (last visited 14 Aug. 2024).

Sometime later, Appellant sent OM another meme of what appeared to be a fish with a spherical appendage hanging from it and the following caption: "The horngus of a dongfish is attached by a scungle to a kind of dillsack (the nutte sac)." OM testified she had no idea how to respond. OM stated that based on the reference to a "nut sack," she thought the meme had a sexual connotation. Feeling "disgusted" and unamused, she replied: "What the fjhgusgtfgcjv."

In late September 2019, OM and Appellant were on Skype discussing her trip to an apple festival. In response to OM stating that the festival was small, Appellant sent her a message that read: "That looks like sperm." Appellant then said, "It's sperm. Semen. Jizz." OM replied, "No, eww, no, no, no." OM testified that she found Appellant's insistence "weird," because "there would be no reason for anything [near her] to have sperm on it." After approximately a 30-minute break in communications, Appellant messaged OM again, asking, "You get the jizz stain out?" OM told Appellant, "[I]t's not that," and that she was still cleaning her room. Appellant responded: "'Cleaning.' I understand. Wash your hands when you're done." OM told Appellant she hated him because she "wouldn't be doing anything like that."

At various points in their Skype conversations, Appellant asked OM about her relationship with her girlfriend, such as whether they had kissed and whether OM was "attracted to her [girlfriend's] female features or . . . attracted to [the] idea that a human likes [her]." Eventually, OM told Appellant that she and her girlfriend had kissed three times. In response, Appellant called OM a "slut" before asking, "How was it?" Appellant asked OM if they kissed "3 times in one go or 3 separate times," whether they kissed "[j]ust on the lips" or with "lips and tongue," and whether OM "drool[ed]" when they kissed. In total, Appellant sent seven messages in quick succession, ending with: "TELLLLLLLL MEEEEEEE." OM testified that she found it weird that Appellant wanted to know the details and responded, "[E]ww," before eventually describing the kiss. Upon learning that OM's girlfriend initiated the kiss, Appellant told OM to "be ready" because her girlfriend was "going to make the next move beyond kissing." Appellant continued to question OM about the circumstances of her kiss before telling her: "That feeling you had is the same with males or females. Just saying . . . don't be afraid to experiment." Appellant then asked OM if she was "doing anything [she] shouldn't."

The next day, OM responded to Appellant and told him that "[n]othing happened." Appellant replied: "That was so like yesterday's comment. How was today? You pregnant?" After OM denied being pregnant, Appellant asked OM if her girlfriend was a virgin. OM testified that she was confused and "weirded out" because she did not understand why that mattered to Appellant or why he was interested. Nevertheless, OM told Appellant that her girlfriend was a

4

virgin. Appellant responded by asking OM how she knew, before asking what the two girls were doing to advance their relationship:

> You planning on doing anything with her? She asked you out, kissed you and now, what? You don't hang out after school. I imagine you two talk, text, sext on the phone? But what you are two doing to further developed [sic] your relationship?

Approximately a week and a half later, OM told Appellant that she and her girlfriend broke up because her girlfriend was now interested in a guy. As OM described being upset about the breakup, Appellant told her that she was "very pretty" and "very beautiful." He concluded by telling OM that relationships were like a "buffet" and that she was "hot enough so [she] can be picky." Over the next month, Appellant asked OM if she had kissed anyone and if she was going to "try the outie" since "the innie didn't work." Several months later, after OM attended a function with a male friend, Appellant messaged her to ask for details. When OM told him that she and her friend had danced and had a lot of fun, Appellant asked: "Am I gonna be a grandpa?"

In March 2020, OM messaged Appellant to wish him a happy birthday. Several hours later, at 0258 hours, Appellant sent OM three memes. At the time Appellant sent the memes, it had been hours since OM's last message to him. The three memes depicted the following: (1) A woman with large breasts, wearing a tank top with no bra underneath and going through an airport security checkpoint, with the caption: "Me: we're gonna have to perform a cavity search / Her: but the detector didn't even- / Me: ma'[a]m it's just protocol;" (2) a collage consisting of images of a hand with one finger extended, two fingers extended, and a man with an amputated arm, each paired with images of a woman who appears to be experiencing various degrees of sexual pleasure, captioned: "Different levels of adult pleasure funny adult meme;" and (3) an image of female genitalia with the cartoon character Piglet superimposed over it, with the caption: "Wherever you see Piglet, you know Pooh is only a few inches away." Upon receiving the memes, OM replied, "[E]ww, what the hell?" During her testimony, OM stated that she interpreted the first meme as an "inappropriate" reference to the woman's body, which was "on the curvier side." She understood the second to be a sexual reference to "being fingered." OM further stated that she did not understand what the third meme meant but recognized that the picture was of female genitalia. Overall, OM testified that she was "disgusted" by the memes and did not understand why Appellant sent them to her.

Later in 2020, OM went to visit Appellant and her mother in Alaska. During this visit, OM noticed that Appellant was acting differently toward her. At trial OM described it as "tense." She then described an occasion when she and Appellant were out for a drive alone. Appellant parked the car on an

abandoned street and told OM he had to tell her something. Appellant then proceeded to tell OM that he thought her legs were "sexy;" that he would "go crazy" whenever OM wore "booty shorts" around the house; and that when OM was running, her breasts "bounced" such that men would stare. Appellant likened OM to a "smaller version" of her mother and pressed her to describe her own legs as "sexy." OM, who was 14 years old at the time of her visit, testified that she was "terrified." Not knowing what to say, OM laughed and said, "[O]kay." Later, as they drove home, Appellant asked OM to promise that she would not say anything to her mother. On another occasion during this visit, Appellant told OM that he thought her "a[*]s looked good in those jeans."

At the end of the summer, OM returned to Germany and shortly thereafter started her freshman year in high school. In October 2020, OM confided in a classmate at school, JF, and then informed her father DM and his wife (her stepmother) about what had occurred in Alaska. Subsequently, OM made a report to the Air Force Office of Special Investigations (OSI).

Appellant was convicted of one specification of sexual abuse of a child by committing a lewd act by communicating to OM, a child who had not attained the age of 16 years, indecent language. The indecent language consisted of the three memes Appellant sent to OM in March 2020.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant challenges the legal and factual sufficiency of his conviction for sexual abuse of a child by committing a lewd act by communicating indecent language to OM. Specifically, Appellant alleges that the Government did not prove that the three memes he sent to OM in March 2020 were indecent, and the Government failed to prove that Appellant communicated the memes with the required criminal intent. Appellant asks this court to set aside the findings and sentence. We are not persuaded by Appellant's arguments and find no relief is warranted.

#### 1. Additional Background

Concerning the specification of which Appellant was convicted, the military judge gave the following instruction:

> In order to find the accused guilty of [sexual abuse of a child by committing a lewd act], you must be convinced, by legal and competent evidence, beyond a reasonable doubt, one, that, at or near North Pole, Alaska, on or about 21 March 2020, the accused committed a lewd act upon [OM], by intentionally communicating to [OM] indecent language, specifically by sending her a meme

depicting an image of a female clitoris with the face of Piglet from Winnie the Pooh superimposed over the clitoral hood and the words, quote, whenever you see Piglet you know Pooh is only a few inches away, end quote; a meme depicting a series of images of a woman apparently experiencing varying degrees of sexual pleasure on the right side, and a picture of one finger, two fingers, and a man's amputated arm on the left side with words, quote, different levels of adult pleasure, funny adult meme, end quote, below; a meme depicting an image of a woman with large breasts going through what appears to be an airport security checkpoint with words, quote, Me: we're going to have to perform a cavity search, Her: but the detector didn't even, Me: Ma'am, it's just protocol, end quote, with an intent to gratify his sexual desire; and, two, that, at the time of the lewd act, [OM] had not attained the age of 16 years.

**2. Law**

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

To convict Appellant of sexual abuse of a child by committing a lewd act as charged, the Government was required to prove that Appellant committed a lewd act by communicating to OM indecent language with an intent to gratify Appellant's sexual desire, and that at the time of the lewd act, OM had not attained the age of 16 years. *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 62.b.(3).

In this context, the definition of a "lewd act" included two references to "indecent," *inter alia*, "intentionally communicating indecent language to a child by any means, including via any communication technology, with an intent to . . . arouse or gratify the sexual desire of any person," 10 U.S.C. § 920b(h)(5)(C); or "any indecent conduct, intentionally done with or in the presence of a child, including via any communication technology," amounting "to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations," 10 U.S.C. § 920b(h)(5)(D).

"Indecent language is that which is grossly offensive to modesty, decency, or propriety, or shocks the moral sense, because of its vulgar, filthy, or disgusting nature, or its tendency to incite lustful thought. Language is indecent if it tends reasonably to corrupt morals or incite libidinous thoughts." *MCM*, pt. IV, ¶ 105.c (directing practitioners to refer to *MCM*, pt. IV, ¶ 62 "if the communication was made in the physical presence of a child").

The indecency of a communication depends on "the context in which it is made." *United States v. Green*, 68 M.J. 266, 270 (C.A.A.F. 2010) (citation omitted); *see also United States v. Hullett*, 40 M.J. 189, 191 (C.M.A. 1994) (citations omitted) (noting that whether language is indecent depends on multiple factors including, *inter alia*, fluctuating community standards, personal relationships, motive, intent, and probable effect).

The United States Court of Appeals for the Armed Forces (CAAF) "has long held that 'indecent' is synonymous with obscene." *United States v. Meakin*, 78 M.J. 396, 401 (C.A.A.F. 2019) (citing *United States v. Moore*, 38 M.J. 490, 492 (C.M.A. 1994)). "It is well-settled law that obscenity is not speech protected by the First Amendment, regardless of the military or civilian status of the 'speaker.'" *Id.* (first citing *United States v. Williams*, 553 U.S. 285, 288 (2008); then citing *United States v. Wilcox*, 66 M.J. 442, 447 (C.A.A.F. 2008)).

### 3. Analysis

Appellant argues that the Government did not prove that the memes he sent to OM were indecent. We disagree.

To properly evaluate the charged language, this court must evaluate the entire record to determine the precise circumstances under which the charged language (the three memes) was communicated. Here the record demonstrates

that Appellant communicated with OM, his then 13-year-old stepdaughter, for months prior to the charged communications. During this time, Appellant frequently turned their communications to sexual topics. Specifically, Appellant queried OM about the physical aspects of her romantic relationship with another teenager, asking OM about whether she had kissed her girlfriend, how they kissed, whether her girlfriend was a virgin, and what the girls were doing (physically) to further their relationship. Additionally, prior to the charged incident, Appellant also sent two other memes with sexual connotations, brought up the topic of sperm, and told her not to be afraid of sexually experimenting with males and females. Appellant also told OM that she was "beautiful," "pretty," and "hot." Appellant sent OM three sexually oriented memes—one depicting a stylized image of female clitoris, another containing a series of images of a woman experiencing varying degrees of sexual pleasure from digital penetration, and a third meme suggesting that a well-endowed woman needed a cavity search.

Later, during OM's visit to Alaska, and when she was then 14 years of age, Appellant told OM that he thought her legs were "sexy;" that he would "go crazy" whenever OM wore "booty shorts" around the house; and that when she was running, her breasts "bounced" in such a way that men would stare. Appellant also likened OM to a "smaller version" of her mother and pressed her to describe her own legs as "sexy." Later, Appellant asked OM to promise that she would not say anything to her mother. On another occasion, while in Alaska, Appellant told OM that he thought her "a[*]s looked good in those jeans." Given this context, we find the memes Appellant sent to his 14-year-old stepdaughter were calculated to "incite libidinous thoughts" or "incite lustful thought" in a way that is "grossly offensive to modesty, decency, or propriety," and therefore qualify as indecent. *United States v. Avery*, 79 M.J. 363, 367–68 (C.A.A.F. 2020) (citations omitted) (relying upon the enumerated Article 134, UCMJ, offense of "Indecent language" with a child to construe the scope of the Article 120b, UCMJ, "lewd act" definition of "indecency"); *see also Hullett*, 40 M.J. at 191 (reciting the Article 134, UCMJ, definition of "indecent language" and explaining indecency is contextual).

Appellant argues now, as he did at trial, that these memes were jokes, and that he sent them for OM's amusement. However, the record does not support that Appellant shared these memes with OM while discussing humorous Internet finds or had reason to believe that, based on their conversations, OM would find them humorous. Rather, Appellant sent these memes in the middle of the night, and hours after their previous conversation had ended. Furthermore, nothing in the communications between Appellant and OM suggest that she found the memes funny; in fact, her response to Appellant's attempts to sexualize the conversations resulted in OM being unamused, "disgusted," and, eventually, "terrified."

While the memes at issue may not be indecent in every context, they became so here when Appellant, as an adult, parental figure, sent them to his 14-year-old stepdaughter. The indecency of these memes is especially evident when they were sent following months of communications where Appellant introduced increasingly sexualized topics to their conversations. Those conversations demonstrate Appellant's unnaturally keen interest in the physical aspects of OM's romantic relationships and of his sexual interest in her. Additionally, these memes, when sent to a child, violated the community standards in the military which include a custom of protecting dependents, most importantly children, from physical, emotional, and sexual harm. *See Hullett,* 40 M.J. at 191 (affirming that the applicable "community standards" for measuring whether language is indecent are those of the military community).

As described above, Appellant's sexually oriented messages to OM involved descriptions of Appellant's sexual desires and fantasies as well as requests for sexual information about OM. We find that a reasonable factfinder could conclude that, under the circumstances, Appellant's messages were "grossly offensive to modesty, decency, or propriety, or shock[ed] the moral sense, because of [their] vulgar, filthy, or disgusting nature, or [their] tendency to incite lustful thought." *See MCM*, pt. IV, ¶ 105.c. We further find that, based on the same facts, a reasonable factfinder could conclude that Appellant sent these communications with the intent to gratify his sexual desire, which his later communications with OM while she was in Alaska confirm.

Therefore, viewing this evidence in the light most favorable to the Prosecution and drawing every reasonable inference from the evidence of record in favor of the Prosecution, we find that Appellant's conviction for sexual abuse of a child is legally sufficient. Additionally, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325.

**B. Fair Notice**

Appellant contends that he was deprived of constitutionally required fair notice that sending three memes constituted sexual abuse of a child. Specifically, Appellant argues that the statute in question, Article 120b, UCMJ, "does not make reasonably clear" that sending these three memes, which he describes as "sexually-related humorous communications," was unlawful. We disagree.

**1. Law**

The Due Process Clause of the Fifth Amendment[6] "requires 'fair notice' that an act is forbidden and subject to criminal sanction" before a person can be prosecuted for committing that act. *United States v. Vaughan*, 58 M.J. 29, 31 (C.A.A.F. 2003) (citing *United States v. Bivins*, 49 M.J. 328, 330 (C.A.A.F. 1998)). Due process "also requires fair notice as to the standard applicable to the forbidden conduct." *Id.* (citing *Parker v. Levy*, 417 U.S. 733, 755 (1974)). The CAAF has found fair notice in "the *MCM*, federal law, state law, military case law, military custom and usage, and military regulations." *Id.* at 31 (citations omitted).

As stated *supra,* Article 120b, UCMJ, criminalizes, among other things, sexual abuse of a minor by committing a lewd act. The statute defines lewd act, *inter alia,* as "intentionally communicating indecent language to a child by any means, including via any communication technology, with an intent to . . . arouse or gratify the sexual desire of any person," 10 U.S.C. § 920b(h)(5)(C); or "any indecent conduct, intentionally done with or in the presence of a child, including via any communication technology," amounting "to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave the morals with respect to sexual relations," 10 U.S.C. § 920b(h)(5)(D).

Congress did not define "indecent language" in relation to Article 120b, UCMJ. However, the President defined indecent language as prohibited by Article 134, UCMJ, as language which is "grossly offensive to modesty, decency, or propriety, or shocks the moral sense, because of its vulgar, filthy, or disgusting nature, or its tendency to incite lustful thought. Language is indecent if it tends reasonably to corrupt morals or incite libidinous thoughts." *MCM*, pt. IV, ¶ 105.c.

As our superior court recently recognized in *United States v. Rocha,* when evaluating a statute:

> [T]he "touchstone" of our analysis must simply be to determine "whether the statute . . . made it *reasonably* clear at the relevant time that the [accused's] conduct was criminal." In other words, absolute precision is not the standard. Rather, statutes must strike the fine balance of being "sufficiently definite to give notice of the required conduct to one who would avoid its penalties" with the requisite broadness to adequately "deal with untold and unforeseen variations in factual situations."

---

[6] U.S. CONST. amend. V.

*United States v. Rocha,* 84 M.J. 346, No. 23-0134, 2024 CAAF LEXIS 250, at *11–12 (C.A.A.F. 8 May 2024) (omission and second alteration in original) (citations omitted).

"The due process concepts of fair notice and vagueness are related." *United States v. Warner*, 73 M.J. 1, 2 n.2 (C.A.A.F. 2013) (citation omitted). "The 'void-for-vagueness' doctrine requires the criminal activity to be defined with sufficient clarity such that 'ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *United States v. Caporale*, 73 M.J. 501, 504 (A.F. Ct. Crim. App. 2013) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). In other words, "[v]oid for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." *Parker*, 417 U.S. at 757 (citing *United States v. Harriss*, 347 U.S. 612, 617 (1954)).

The constitutionality of a statute is a question of law and is ordinarily reviewed de novo. *United States v. Wright*, 53 M.J. 476, 478 (C.A.A.F. 2000) (citation omitted).

"Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Ahern* 76 M.J. 194, 197 (C.A.A.F. 2017) (quoting *United States v. Gladue*, 67 M.J. 311 (C.A.A.F. 2009)). "[T]here is a presumption against the waiver of constitutional rights." *United States v. Harcrow*, 66 M.J. 154, 157 (C.A.A.F. 2008) (internal quotation marks and citation). Appellant may waive the right to raise a constitutional issue on appeal provided it is "clearly established that there was 'an intentional relinquishment or abandonment of a known right or privilege.'" *Id.* (quoting *Brookhart v. Janis*, 384 U.S. 1, 4 (1966)). In cases of forfeiture, we review for plain error where an appellant has the burden of demonstrating: "(1) error that is (2) clear or obvious and (3) results in material prejudice to his substantial rights." *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citation omitted). In instances where a clear or obvious error rises to the level of a constitutional violation, the burden shifts to the Government to "show that the error was harmless beyond a reasonable doubt." *Rocha,* 2024 CAAF LEXIS 250, at *7 (quoting *United States v. Tovarchavez*, 78 M.J. 458, 462–63 (C.A.A.F. 2019)).

### 2. Analysis

Appellant raises the issue of fair notice for the first time on appeal. Applying the presumption against waiver of a constitutional right, we find Appellant forfeited this issue and review for plain error. We find Appellant has failed to meet his burden of demonstrating plain or obvious error.

Here, we conclude that the elements and definitions contained in the statute provided all servicemembers, including Appellant, with fair notice that the specific act of communicating indecent language to a child for the purpose of arousing or gratifying the sexual desire of any person is prohibited under Article 120b, UCMJ. Furthermore, we find it would not require a significant leap of logic for a servicemember of ordinary intelligence to conclude that communicating sexually suggestive language to a child for such a purpose, via communication technology, was prohibited.

To the extent Appellant argues that failure of 10 U.S.C. § 920b(h)(5)(C) to define "indecent language" results in insufficient notice, we reject that argument. Article 120b, UCMJ, is not the only offense in the *MCM* relating to indecent language. In Article 134, UCMJ, the President not only enumerated a separate offense for communicating indecent language, but also defined indecent language and identified the context in which it applies to Article 120b, UCMJ, offenses. Therefore, a person of ordinary intelligence would understand that for the purposes of Article 120b, UCMJ, indecent language is that which is "grossly offensive to modesty, decency, or propriety, or shocks the moral sense, because of its vulgar, filthy, or disgusting nature, or its tendency to incite lustful thought." *See MCM*, pt. IV, ¶ 105.c.

The law does not require that the statute or regulation "expressly set forth all conceivable instances of impermissible conduct" to meet the requirements of fair notice. *See United States v. Pope,* 63 M.J. 68, 74 (C.A.A.F. 2006) (holding that the regulation did not have to specify all possible prohibited behavior to provide fair notice, given the "evolving and innumerable ways" misconduct could occur); *see also Rocha*, 2024 CAAF LEXIS 250, at *12 (holding that "absolute precision is not the standard" that the statute must have in describing criminal conduct). To the contrary, the law only requires that the statute be "*reasonably* clear" as to the prohibited conduct. *Rocha*, 2024 CAAF LEXIS 250, at *11. Here, we find that elements and definitions contained in Article 120b, UCMJ, along with the definition of indecent language in Article 134, UCMJ, provide sufficiently definite notice of the required conduct to one who would avoid its penalties." *Id.* at *12 (citation omitted).

**C. Timely Appellate Review**

The military judge sentenced Appellant on 27 February 2022. Appellant's record of trial was docketed with this court on 24 February 2023. Over the Government's objection, this court granted Appellant's request for 12 enlargements of time to file his assignments of error brief. Appellant's brief was filed on 16 May 2024, 447 days after the case was docketed with the court. On 17 June 2024, the Government filed their answer to Appellant's brief. On 21 June 2024, Appellant, with the consent of the Government, requested an enlargement of time to file his reply brief, which we granted. Appellant then filed his

reply brief 28 June 2024, 490 days after the case was docketed with the court. This court is issuing its opinion 18 months and 2 days after docketing.

This court recognizes "convicted servicemembers have a due process right to timely review and appeal of [their] courts-martial convictions." *Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). A presumption of unreasonable delay also arises when appellate review is not completed, and a decision not rendered within 18 months of a case being docketed. *Moreno*, 63 M.J. at 142. If there is a presumptive or an otherwise facially unreasonable delay, we examine the matter under the four non-exclusive factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citing *Barker*, 407 U.S. at 530) (additional citations omitted). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

A decision in Appellant's case was not rendered within 18 months. Appellant has not raised any issue with this court concerning the post-trial processing of his case and likewise has not claimed any prejudice as a result of the delay. In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. *Moreno,* 63 M.J. at 138–39 (citations omitted). As to the first type of prejudice, where Appellant does not prevail on the substantive grounds of his appeal, there is no oppressive incarceration. *Id.* at 139. Similarly, looking at the third type of prejudice, where Appellant's substantive appeal fails, his ability to present a defense at a rehearing is not impaired. *Id.* at 140. Finally, with regards to the second type of prejudice, anxiety and concern, "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* Appellant has made no showing of such particularized anxiety or concern with respect to the delay in question, and we perceive none in his case.

Finally, recognizing our authority under Article 66(d), UCMJ, 10 U.S.C. § 866(d), we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See Tardif*, 57 M.J. at 225. After considering the factors enumerated in *United*

*States v. Gay*, 74 M.J. 736, 742 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude no such relief is appropriate.

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of the Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court